**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,        )
                                 )
        V.                       )        Criminal No.  07-00182-2
                                 )        Judge Nora Barry Fischer
ROMULUS PASCA, ET AL.,           )
        Defendant.               )

**<u>OPINION and ORDER</u>**

This matter is before the Court on a Motion to Suppress Evidence and Statements [55], filed

by Defendant Romulus Pasca on November 13, 2007.  For the following reasons, said motion is

denied.

FINDINGS OF FACT

The credible testimony offered at the January 28, 2008 suppression hearing established the

following facts.[1]

On April 13, 2007, the Monroeville Police Department received a anonymous 911 call

reporting suspicious activity of two white males[2] at an Automated Teller Machine ("ATM") located

at a Citizens Bank along Route 22 in Monroeville, Pennsylvania. The 911 caller reported two men

"messing" with the Citizens Bank ATM machine.  According to the 911 caller, the individuals would

approach the ATM and "mess" with the machine, but would leave when a customer approached to

use the ATM.   Subsequently, the two men would return to their green mini-van, wait until no one

was at the ATM, and then return to the ATM machine.

At approximately 6:32 a.m. on that morning, at which time it was still dark, Officers Clinton

---

[1]

All citations to "Transcript" refer to the January 28, 2008 hearing.

[2]

Officer McMaster testified that the anonymous 911 caller described "two males," and
specifically, he believed, "two white males."  (Transcript, at 6:15-16).

McMaster and John Beehner of the Monroeville Police Department responded to the 911 call. They immediately did not see any individuals at the Citizens Bank ATM machine. After checking the area, the officers drove to a nearby bank, namely the Dollar Bank, located approximately a few hundred yards from the Citizens Bank.

The officers approached the Dollar Bank location in their vehicle and observed a white male standing at the drive-thru ATM machine (later identified as co-Defendant Vasile Ciocan, Criminal No. 07-00182-2) and another white male standing at the walk-up ATM machine (later identified as Defendant Pasca). As they approached, both men turned around, saw the officers in their vehicle,[3] and began to walk away "at a brisk manner" in different directions. (Transcript at 7:15-16; 8:21-22). The officers drove their vehicle along side Defendant Pasca, Officer McMaster exited the vehicle, and instructed Defendant Pasca to stop. Defendant Pasca did not stop immediately. After repeating his orders,[4] Pasca finally stopped and faced McMaster with both hands in his front pants pockets.[5] Officer McMaster drew his weapon and directed Defendant Pasca to remove his hands from his pockets. Officer McMaster testified that he ordered him to remove his hands "several times." (Transcript, at 9:18-20). As he ordered him to remove his hands, Officer McMaster continued to approach Defendant Pasca with his weapon drawn. Once he was close enough to the Defendant,

---

[3]

The Officers were in their standard uniforms and riding in a marked patrol vehicle. (*See* Transcript, at 19:10-13).

[4]

Officer McMaster testified that he ordered Defendant Pasca to stop twice, but he was not "totally sure." (Transcript at 9:7-8).

[5]

As discussed further below, it is unclear whether Defendant Pasca had his hands in his pockets when he faced Officer McMaster or placed his hands in his pockets as he turned and in response to Officer McMaster's orders.

Officer McMaster holstered his weapon and "grabbed his arms so he had no control over his arms and ... removed his hands from his pockets." (Transcript, at 9:22-24). Officer McMaster placed Defendant Pasca's hands on his vehicle and conducted a pat-down search. Officer McMaster observed a "bulge" in one of Pasca's front pockets, which, after he touched it, described it as "a hard rectangular items or items." (Transcript, 10:5-6). He elaborated: "It felt a little bit--not as wide as a cigarette pack, but it wasn't a cellphone." (Transcript, 10:6-7). Fearing for his safety,[6] Officer McMaster pulled the items out of Defendant Pasca's pocket: "a wad of cash" and a small, manila envelope, inside of which were three blank, white cards with a magnetic strip on the back. (Transcript, at 11:9-12 & 30:5-11). At that point, Officer McMaster placed Defendant Pasca under arrest.

Once Officer McMaster had Defendant Pasca under control (i.e., under arrest), Officer Beehner looked for the "second actor." Officer Beehner described his encounter with the co-Defendant:

> He went back towards the rear of the building and I saw him over by a dumpster. And then when I looked back, he was walking from the dumpster towards the Lowe's parking lot, and that's when I confronted him and told him to stop.

---

[6]

Officer McMaster explained his fear:

> In March, we received an update about people hiding weapons in cellphones. They can make cellphones like guns. They can make--hide small one-shot guns in cigarette packs. Keys that can be turned into a knife in a reasonable amount of time.
> It was a Power point presentation several pages long about all these weapons, or normal every-day objects they make into weapons.

(Transcript, at 10:24-11:6).

(Transcript, at 44:3-6).  Ciocan complied and Officer Beehner "got ahold of him and brought him over to the police car also." (Transcript, at 44:7-11).[7]  An eventual search of the dumpster conducted by Officer McMaster (but not Officer Beehner)[8] revealed money and counterfeit ATM cards scattered in the bottom in plain sight.

After arresting the Defendants, the officers saw two green mini-vans adjacent to each other in a parking lot along Route 22, which were consistent with the description provided by the anonymous 911 caller. One had Pennsylvania registration and the other had Illinois registration. Upon questioning at the scene, both suspects refused to answer in which van they arrived.  Officer McMaster testified, upon noticing that the door to the van with Illinois registration was unsecured, that he opened the door and looked in the glove box.[9]  While now in custody, the officers re-searched each suspect and found a set of car keys on co-Defendant Ciocan.  Corporal Hainsey from the Monroeville Police Department pushed the unlock button on the remote control key discovering that it unlocked the van bearing an Illinois license plate, number G335418. The vehicle was impounded and towed to the Monroeville Training Center.  Pursuant to a federal search warrant, authorities searched the van and found inculpatory evidence.[10]

The suspects were transported to the Monroeville Police Department where Defendant Pasca

---

[7]

It is unclear from the testimony when the police officers arrested Ciocan; however, at the very least, the officers seized and detained Ciocan once Officer Beehner "got ahold of him and brought him over to the police car also."  (Transcript at 44:7-11).

[8]

Officer Beehner testified that he did not search the dumpster.  (*See* Transcript at 44:15-16).

[9]

There is no testimony as to what Officer McMaster found in the glove box, if anything.

[10]

The Government provides no further detail as to the evidence discovered in the van.

was questioned by Special Agent Timothy Lauster of the Federal Bureau of Investigation ("FBI"). Before questioning, Special Agent Lauster read (in English) to Defendant Pasca an "Advice of Rights" form (*see* Exhibit 2 at Docket No. 67), known as a FD-395 form, which he signed and which Special Agent Lauster testified he appeared to understand. In addition to the FD-395 form, Special Agent Lauster also read to Defendant Pasca a "Consent to Search" form (*see* Exhibit 3 at Docket No. 67), known as a FD-26 form, which again he signed and appeared to understand, according to the Agent. In said consent form, Defendant Pasca gave consent to law enforcement to search Room 308 at the Red Roof Inn as well as two e-mail addresses. This initial interview lasted about one hour. Special Agent Lauster did not testify regarding the substance of this initial interview.

Later that day, Defendant Pasca appeared before a federal magistrate judge for his initial appearance. Thereafter, Defendant Pasca agreed to be interviewed again by FBI agents for a second time. At this time, Defendant Pasca signed another FD-395 form in Romanian and another FD-26 form also in Romanian, in which he gave consent to search the hotel room and e-mail addresses as in the first FD-26 form. (*See* Exhibits 4 & 5 at Docket No. 67). This second interview lasted approximately forty-five minutes. Again, Special Agent Lauster did not testify regarding the substance of this second interview. Special Agent Lauster further testified regarding the execution of a number of search warrants on the vehicle, the twenty blank credit cards obtained during the course of the entire investigation, the electronic storage devices found in the vehicle, a storage locker in Virginia, and the hotel room at the Red Roof Inn.

PROCEDURAL HISTORY

On May 8, 2007, the Government filed an Indictment charging Defendant Pasca as well as his co-Defendant Ciocan with the following: (1) conspiracy to commit offenses against the United

States, namely (a) bank fraud, in violation of 18 U.S.C. § 1344(1), and (b) the use of counterfeit access devices, in violation of 18 U.S.C. § 1029(a)(1); (2) bank fraud, in violation of 18 U.S.C. § 1344(1) and (2); and (3) aggravated identity theft, in violation of 18 U.S.C. § 1028(a)(1) and (2). After numerous extensions of time to file pre-trial motions, on November 13, 2007, Defendant Pasca filed the instant Motion to Suppress Evidence and Statements.[11] After an extension of time to respond, on January 3, 2008, the Government filed its Response to Motion to Suppress Evidence and Statements. On the same day, the Court set Defendant's motion for a hearing. On January 28, 2008, the Court held a suppression hearing, at which Officer McMaster, Officer Beehner, and Agent Lauster testified, as outlined above. After hearing all the testimony and at the suggestion of defense counsel, the Court set a post-hearing briefing schedule. After a short extension of time granted by the Court upon motion by Defendant, on March 3, 2008, Defendant Pasca filed his Post-Hearing Memorandum in Law in Support of Defendant's Motion to Suppress Evidence and Statements. (Docket No. 77).[12] On March 13, 2008, the Government filed its Response to Post-Hearing Brief in Support of Motion to Suppress Evidence and Statements, in which it advised the Court that the Government intends to rely on its previously-filed response. (Docket No. 79).

---

[11]

On December 7, 2007, Defendant Ciocan pled guilty to counts 2 and 3 in the instant Indictment (bank fraud and aggravated identity theft) as well as the sole count in the Indictment Criminal No. 07-00398 (access device fraud), which was transferred from United States District Court for the Northern District of Ohio.

[12]

Defendant Pasca first filed his Post-Hearing Memorandum in Law in Support of Defendant's Motion to Suppress Evidence and Statements (Docket No. 74) along with a Motion to Extend Time to File Supplemental Brief (Docket No. 75) on March 1, 2008. After the Court granted the latter motion, Defendant re-filed his post hearing brief on March 3, 2008, referenced above (Docket No. 77).

ARGUMENTS PRESENTED

In the instant motion, Defendant Pasca moves to suppress the evidence and statements to law enforcement officers "because the officers lacked probable cause or even reasonable suspicion to stop, search and seize Mr. Pasca." (Docket No. 55, at 1). As to only the statements, in addition to being fruit of an alleged illegal intrusion under the Fourth Amendment, Defendant Pasca asserts that his statements to law enforcement should be suppressed because they were made in violation of the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny. In response, the Government separately addresses the evidence and statements, providing argument as to both.

ANALYSIS

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citations omitted). At the conclusion of the suppression hearing held on January 28, 2008, the Court commented as to the credibility of both police officers and Special Agent Lauster: "I believe all three gentlemen who appeared, both officers and the agent, gave very credible testimony this afternoon." (Transcript at 66:25-67:2).

1.      *Terry stop and frisk*

First, the Government asserts that pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the police officers possessed reasonable suspicion to stop and to conduct a pat-down search of the Defendant for weapons or contraband. Subsequent to the frisk, under the plain feel doctrine, the Government argues, the pat-down search revealed "a hard rectangular items or items," which the police officer reasonably mistook as a weapon and thus the removal of the same was within the confines of *Terry*.

The *Terry* stop and the *Terry* pat-down frisk are two separate and distinct determinations: "our inquiry is a dual one-whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. 19-20. In other words, the frisk does *not* follow *automatically* from the stop. *See Adams v. Williams*, 407 U.S. 143, 146 (1977) ("So long as the officer is entitled to make a forcible stop, *and* has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose") (citing *Terry*, 392 U.S. at 30) (footnote omitted) (emphasis added). Accordingly, the Court will address the *Terry* stop and frisk in two parts: (1) whether reasonable suspicion existed to stop and detain Defendant Pasca under *Terry*; and (2) whether the pat-down frisk was objectively reasonable under *Terry*, i.e., whether the police officer's removal of the "hard, bulky item" in Defendant Pasca's pocket pursuant to the "plain feel" doctrine was reasonable.

A.    *Terry stop*

In *Terry v. Ohio*, the Supreme Court held that:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot *and* that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Terry*, 392 U.S. at 30 (emphasis added). Subsequent to *Terry*, in *Adams v. Williams*, 407 U.S. 143 (1972), the Supreme Court seemingly expanded upon the narrow holding in *Terry* to include an

investigative stop:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. ... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Id.*, at 146. A few years later, the Supreme Court in *Adams* elaborated upon *Terry*: "These cases together establish that in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975).

Before turning to the pertinent facts, the Court finds it necessary to address when the police officers seized the Defendant for the Fourth Amendment is not implicated in this context until a seizure occurs. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment"). While the Government does address this issue, the Defendant offers two alternatives: (1) the officers seized the Defendant "the moment Officer McMaster ordered him to stop," or (2) the officers seized the Defendant "once Officer McMaster ordered him to take his hands out of his pockets at gunpoint and then searched him," (Docket No. 74, at 5). The Court agrees with the latter.

Relevant to this analysis is *California v. Hodari D.*, 499 U.S. 621 (1991), in which the Supreme Court found that for purposes of the Fourth Amendment, a seizure occurs when police apply physical force to the person being seized, or, where force is absent, the person submits to the show of police authority. *Id.* at 626-28; *see also United States v. Valentine*, 232 F.3d 350, 358 (3d

Cir. 2000). "Thus, if the police make a show of authority and the suspect does not submit, there is no seizure." *Valentine*, 232 F.3d at 358 (citing *Hodari D.*, 499 U.S. at 626). Applied here, as the Defendant clearly did not submit to Office McMaster's show of authority, considering his continual refusals to stop and remove his hands from his pockets, the Court finds that the Defendant was not seized until Officer McMaster grabbed him and began his pat down frisk, notwithstanding his eventual compliance with Officer McMaster's order to stop. *See Valentine*, 232 F.3d at 359 ("Even if [the defendant] paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until [the police officer] grabbed him"). Accordingly, all conduct prior to said seizure may be included in the reasonable suspicion analysis of the *Terry* stop. *See id.* (providing that "what [defendant] did after he failed to comply with a police order and prior to a seizure may be considered in evaluating reasonable suspicion").

Turning to the specific facts, in its response brief, the Government asserts the following in support of a finding of reasonable suspicion to stop the Defendant: "information provided by the tip from a citizen witnessing the crime, coupled with the defendant's behavior at the scene warranted the police officers['] temporary detention and search of Pasca." (Docket No. 62, at 8). In particular, the Government relies on three "critical facts:" (1) "the citizen tip proved reliable and was corroborated," (Docket No. 62 at 9); (2) "both actors immediately attempted to flee upon seeing the approaching officers," (Docket No. 62 at 9); and (3) "according to Officer McMaster's report, Pasca 'immediately put his hands into his front pockets' " and he refused to remove them after several

orders to do so from Officer McMaster, (Docket No. 62 at 10).[13]  The Court finds that the Government's argument in support of reasonable suspicion is factually flawed insofar as (1) the officers did not completely corroborate the information provided by the anonymous 911 caller and (2) the testimony reveals that Defendant Pasca had his hands in his pockets (as opposed to putting his hands in his pockets upon seeing the officers).

First, contrary to the Government's assertion that the officers corroborated *in toto* the information from the anonymous 911 caller, neither of the officers provided such testimony indicating full and complete corroboration.  Officer McMaster testified that, as they approached the two white males at the Dollar Bank ATM machines, "both men turned around, saw us, and they both immediately began walking in different directions at a brisk manner."  (Transcript, at 7:14-16).  Along the same lines, Officer Beehner testified that "[a]s we drove up, as we were pulling up, the two men saw us and they left the ATM machines."  (Transcript, at 41:8-9).  While both officers recounted what the anonymous 911 caller reported in terms of the alleged suspicious activity at Citizens Bank, neither of the officers testified that they witnessed the two males at the Dollar Bank ATM machines engage in any similar suspicious activity, i.e., in the words of Officer Beehner, "go up to an ATM machine and mess with it ... and when someone would come up to the ATM machine or drive by, they would leave the ATM machine and go back to their van" and "once that person left, they would go back up to the ATM machine and do the same thing again."  (Transcript, at 40:19-24).  In other words, the officers did not corroborate the anonymous 911 caller's information  by way of their own personal observation.  However, the suspects' immediate flight upon sight of the police

---

[13] The Government has not placed into evidence Officer McMaster's report.

officers made total corroboration virtually unfeasible. Moreover, the officers corroborated the anonymous 911 caller's information in part through their personal observation of two white males at ATM machines in close proximity (approximately a couple hundred yards away, *see* Transcript at 7:3-6) to the site of the reported incident.

Second, the Government asserts that upon seeing the officers, Defendant Pasca immediately put his hands into his front hip pockets and subsequently refused to remove them after several orders to do so. (Docket No. 62 at 10). However, once again, the Government's presentation of the facts in its brief is not exactly aligned with the testimony of the officers provided at the hearing. In point of fact, Officer McMaster testified on cross-examination: "I don't know if he had his hands in his pockets at that time already or he put them in when he saw me. I wasn't sure." (Transcript, at 25:11-12). Officer McMaster's testimony on direct examination made no mention of putting his hands in his pockets: "He turned around and I noticed his hands were in his pockets, both hands in his front pockets." (Transcript, at 7:20-21). *See also* Transcript, at 42:13-14 ("And when the defendant finally did stop, when he turned towards Officer McMaster, he had his hands in his pockets") (Officer Beehner testifying). The Court belabors this (perhaps seemingly) minute detail because of the nature of and justification behind a *Terry* stop and frisk, i.e., suspicion of criminal activity and officer safety. A person who puts his hands into his pockets upon seeing the police may be reaching for a weapon.[14] Nevertheless, while the officers' testimony appears to suggest that Defendant Pasca's hands were in his pockets before he saw the officers as opposed to the Government's

---

[14]

The Government obviously agrees: "Understandably, Pasca's act of putting both hands into his pockets created an apprehension by the officers of Pasca's attempt to reach for a concealed weapon ... ." (Docket No. 62 at 10).

assertion that he put his hands in his pockets in response to seeing the officers, the Court recognizes that Defendant was walking away from the officers, and thus their vantage points, as to where his hands were and when he placed his hands in his pockets, were less than ideal. In the Court's practical experience, Defendant likely had his hands out of his pockets while standing at the ATM machine as well as when walking away therefrom for it is uncommon and uncomfortable to walk in a brisk manner with one's hands buried in his or her front pants pockets. Therefore, it is at least feasible that Defendant may have put his hands in his pockets after seeing the officers, even if the precise timing of the same is unclear from the record. Furthermore, the Court is cognizant of the fact that the officers testified regarding split second, on-the-spot observations in which they reacted to the continuing suspicious circumstances. Hence, any factual discrepancies between the Government's brief and the officers' testimony, to the extent any exist, "are either easily reconcilable by an officer acting in the heat of the moment or are facts that do not negate the existing reasonable suspicion," *Brown v. City of Philadelphia*, Civil Action No. 07-0192, 2008 WL 269495, at *5 (E.D. Pa. Jan. 29, 2008), as the Court finds below.

"In analyzing whether an officer had a reasonable suspicion, courts 'must consider the totality of the circumstances--the whole picture.'" *United States v. Yamba*, 407 F.Supp.2d 703, 708 (W.D. Pa. 2006) (quoting *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (internal citations omitted)). Viewing all the facts taken together, the Court finds that the police officers possessed reasonable suspicion under *Terry* to stop and detain the Defendant. First, the report from the anonymous 911 caller regarding two white males at an ATM machine at Dollar Bank and the officers' observation of two white males at another ATM only a few hundred yards away. "Confronting inquiries into the validity of *Terry* stops, courts have repeatedly found that the

combination of an individuals's time and place proximity to the crime with his or her match to a flash description provided reasonable suspicion." *Brown*, 2008 WL 269495, at *5 (collecting cases in accord). Here, the 911 call reported suspicious (possibly criminal) activity of two white males at an ATM machine and, shortly thereafter, the police officers observed two white males at another ATM machine, a few hundred yards away. Furthermore, Officer Beehner testified that he "believed [they] received information that the two [white male suspects] had gotten into their green minivan and were in the Lowe's parking lot. So, we decided to drive through there and check, and that's right on the way to the Miracle Mile shopping center which contains another three banks over there. So, we decided we would check that area." (Transcript at 39:23-40:4). Hence, the officers received information that the two white male suspects reported "messing" with the ATM machines at the Citizens Bank had left and proceeded through the parking lot, thus bolstering the police officers' decision to stop and investigate the two white male suspects at the Dollar Bank ATM machines. Along the same lines, Officer McMaster testified regarding the entire scene, which, based on his twenty years of experience, raised suspicion:

> I have been on patrol for twenty years and I have seen several people at those MAC machines and the night deposit box that early in the morning and they don't flee when they see the police. They wave to us, or their vehicle is parked either along the curb or in close proximity to the machines. There were no vehicles in close proximity to the machines.

(Transcript at 34:4-10). Moreover, the fact that one of the two suspects stood in the drive-thru lane also raised suspicion. (Transcript at 34:14-16).

Second, upon sight of the police officers (in a marked patrol vehicle and in uniform, *see* Transcript at 19:10-13), the two male suspects immediately turned and walked away, according to

both officers, in a brisk manner. (*See* Transcript at 7:14-16 (Officer McMaster testifying)); (Transcript at 41:14-15 (Officer Beehner testifying)). In *Sibron v. New York*, 392 U.S. 40 (1968), in the context of probable cause to arrest, the Supreme Court noted that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea ... ." *Id.* at 66. More recently, in *Illinois v. Wardlow*, 528 U.S. 119 (2000), in which the Court considered whether a *Terry* stop was supported by reasonable suspicion, the Court expounded on the cause of suspicion based on "unprovoked flight upon noticing the police:"

> Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Wardlow*, 528 U.S. at 124-125. Thus, even if flight does not occur in a high crime area, as was the case in *Wardlow*, the same is still "suggestive" of "wrongdoing." Similarly, the U.S. Court of Appeals for the Third Circuit has relied on attempts to flee or mere attempts to avoid law enforcement as a factor in the reasonable suspicion determination. *See United States v. Brown*, 159 F.3d 147, 150 (3d Cir. 1998) (considering, among other factors, suspect's "attempt[] to elude [officer] by ducking into an alleyway and a bar"); *U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1978) (considering flight from law enforcement, combined with other factors, may support *Terry* stop). While the Court recognizes that the suspects here did not flee, in the traditional sense of the word, as applied in this context, the suspects' behavior is still relevant to the Court's analysis. *See United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("Walking away from

police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area, but it is a factor that can be considered in the totality of the circumstances"). Using commonsense judgment including inferences drawn from human behavior, and in light of Officer McMaster's testimony regarding the normal response from persons standing at ATM machines in response sighting police officers, the Court finds that the suspects' unprovoked decision to turn and walk away upon sight of the police officers in their patrol vehicle contributes to a finding of reasonable suspicion. *See Valentine*, 232 F.3d at 357 (finding reasonable suspicion to stop based on, among other things, the police officers' observation of "[the defendant] and his two companions walk[ing] away as soon as they noticed the police car"). Furthermore, according to both officers, the two white male suspects split up and walked in opposite directions, (Transcript at 7:14-16) (Officer McMaster testifying); (Transcript at 41:8-11) (Officer Beehner testifying), which is "a tactic commonly used by criminals to frustrate pursuing police." *Lawrence v. United States,* 509 A.2d 614, 616 (D.C. Cir. 1986) (finding reasonable suspicion where, upon seeing police officer, suspects "quickened their pace" and "split up").

Third and finally, Defendant Pasca continually refused to obey lawful police orders.[15] When the officers first encountered the Defendant, Officer McMaster ordered him to stop, perhaps twice but certainly once. (*See* Transcript at 42 12-12). After he reluctantly complied, Pasca turned and faced the officers, who noticed that his hands were in his pockets. At this point, Officer McMaster

---

[15]

In response to the Court's inquiry regarding whether Defendant Pasca understood his orders, Officer McMaster testified that "he seemed to understand." (Transcript at 37:22). He further testified that "[w]hen we got him back to the jail cell, he understood verbal orders and commands and requests while we were processing him." (Transcript at 37:22-24).

ordered Defendant to remove his hands several times (at least three times, *see* Transcript at 42:19-21), yet Pasca refused to comply. After the suspect refused to comply with the first or second order to remove his hands, Officer McMaster drew his weapon and again ordered Pasca to remove his hands. (Transcript at 42:19-21). Still, the suspect refused. In fact, the Defendant never complied with any of Officer McMaster's orders to remove his hands insofar as Officer McMaster took hold of the suspect's arms and forcibly removed Pasca's hands from his pockets. (*See* Transcript: 9:22-24) (Officer McMaster testifying); (Transcript:43:17-21) (Officer Beehner testifying). While the Court opines that having one's hands in pockets does not, in and of itself, grant police officers the authority to stop and detain individuals under *Terry*, coupled with his continual refusals to comply with lawful police orders especially once Officer McMaster drew his weapon, said conduct may properly factor into an officer's determination of reasonable suspicion.[16] *See Brown*, 159 F.3d at 150

---

[16]

The Court recognizes that a person need not answer questions put to him by police officers in a mere encounter:

> The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

*Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (internal citations omitted). *See also Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure") (citations omitted). However, as demonstrated above, the Court does not solely rely on Pasca's refusal to obey police orders in support of a finding of reasonable suspicion. Furthermore, the Court opines that there is a significant difference between an individual's right to refuse to answer questions from a police officer during a mere consensual encounter and an individual's refusal to obey a lawful police order. While the latter may perhaps not alone justify a detention or seizure, *see Bostick*, *supra*, a police officer (and a reviewing court) may certainly consider as much in determining reasonable suspicion, especially where the lawful order concerns the protection and safety of the police officer and others nearby, as is the case here.

(considering suspect's decision to "disregard[] the officer's request to 'hold up' and continue[] walking"); *United States v. Moorfield,* 111 F.3d 10, 14 (3d Cir. 1997) ("[Defendant]'s furtive hand movements and refusal to obey the officers' orders constituted suspicious behavior"); *United States v. Focareta*, Criminal No. 05-227, 2006 WL 2087515, at *10 (W.D. Pa. July 25, 2006) (finding that "given the time of day, the multiple reports emanating from [the site of the incident] about criminal activity, including the theft of firearms, and *most importantly*, [the defendant]'s repeated furtive gestures and failure to follow officers' orders, ... reasonable suspicion existed for the officers' *Terry* stop of [the defendant]") (emphasis added).

In short, the Court has little trouble in concluding that all of the above articulable facts, taken together, clearly amount to reasonable suspicion to stop the Defendant under *Terry*.

      B.    *Terry pat down frisk*

Before turning to the scope of the frisk, i.e., Officer McMaster's decision to remove the "hard rectangular item or items" from Pasca's pocket and open the envelope, the Court first must determine whether it was objectively reasonable for the police officer to frisk the Defendant. In *Terry*, the Supreme Court found facts which justified the police officer's limited search for weapons once he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous, by applying the following standard: whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry*, 392 U.S. at 21-22. Here, the Court finds that "a man of reasonable caution" would have believed that Pasca may have been armed and dangerous given (1) the bulge in his front pants pocket, which Officer McMaster saw, (*see* Transcript at 10:4); (2) his suspicious behavior, including his immediate flight upon sight of police officers and refusal to

18

remove his hands from his pockets; and (3) the police officer's subjective fear for his safety, (*see* Transcript at 10:9-14; 35:11-12). *See Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (concluding that "[t]he bulge in the jacket permitted the officer to conclude that [the suspect] was armed and thus posed a serious and present danger to the safety of the officer"). Accordingly, Officer McMaster's decision to frisk the Defendant for weapons was objectively reasonable and within the confines of *Terry*.

The Court now turns to the scope of that frisk, in particular the officer's pat-down and removal of the bulge in Defendant's pocket. During a valid *Terry* stop, a police officer may conduct a limited frisk of a suspect for weapons if he reasonably believes that his safety or the safety of others is threatened. In *Terry*, the Supreme Court limited the breadth of the frisk approved therein, noting that "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." 392 U.S. at 18. Subsequent to *Terry*, the Court later expounded on that statement:

> The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. ... So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.

*Adams v. Williams*, 407 U.S. at 146 (footnote omitted). Approximately ten years later, the Supreme Court further fleshed out the permissible scope of an investigative stop, affirmatively noting that while the scope of the detention may vary to some extent based on the facts of the case at hand, "[t]his much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

Of particular relevance here, in *Minnesota v. Dickerson*, the Supreme Court took up the issue of "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*," ultimately deciding that "the answer clearly is that they may, so long as the officers' search stays within the bounds marked by *Terry*." 508 U.S. at 373. In that case, police officers observed the defendant leaving what was known to them as a "crack house." When he saw the officers in their patrol car, the defendant "abruptly halted and began walking in the opposite direction." *Id.* at 368-69. Arousing suspicion, the police officers ordered the defendant to stop and one of the officers conducted a *Terry* search of the defendant. According to the Court, "[t]he search revealed no weapons, but the officer did take an interest in a small lump in [the defendant's] nylon jacket." *Id.* at 369. The officer testified later at an evidentiary hearing that, "[a]s I pat-searched the front of his body, I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." *Id.* At that point, the officer "reached into [the defendant's] pocket and retrieved a small plastic bag containing one fifth of one gram of crack cocaine." *Id.* The state trial court admitted the contraband by "analogizing to the 'plain-view' doctrine." *Id.* The intermediate state court reversed and the Minnesota State Supreme Court affirmed noting that "[e]ven if we recognized a 'plain feel' exception, the search in this case would not qualify" because "the pat search of the defendant went far beyond what is permissible under Terry." *State v. Dickerson*, 481 N.W.2d 840, 843-44 n.1 (Minn. 1992), *aff'd* 508 U.S. 366 (1993). The Supreme Court agreed.

Before addressing the "plain feel" concept, the Supreme Court first described the "plain view" doctrine from which it derived:

> [I]f police are lawfully in a position from which they view an object,

> if its incriminating character is immediately apparent, and if the
> officers have a lawful right of access to the object, they may seize it
> without a warrant. If, however, the police lack probable cause to
> believe that an object in plain view is contraband without conducting
> some further search of the object- i.e., if its incriminating character [is
> not] immediately apparent-the plain-view doctrine cannot justify its
> seizure.

*Id.* at 375 (citations and internal quotation marks omitted) (alteration in original). The Court applied

the plain view rule to "the tactile discoveries of contraband":

> If a police officer lawfully pats down a suspect's outer clothing and
> feels an object whose contour or mass makes its identity immediately
> apparent, there has been no invasion of the suspect's privacy beyond
> that already authorized by the officer's search for weapons; if the
> object is contraband, its warrantless seizure would be justified by the
> same practical considerations that inhere in the plain-view context.

*Id.* at 375-376. Implementing the plain feel rule, the Court held that because the incriminating

character of the object was not immediately apparent to him (as determined by the lower court), the

officer's "further search of [defendant's] pocket" which revealed the contraband nature of the item

was constitutionally invalid.[17] *Id.* at 379.

Essentially, the *Dickerson* Court determined that police may seize contraband discovered

through a pat-down of a suspect's clothing if the contraband either (1) reasonably feels like a weapon

or (2) is immediately apparent as recognizable contraband through "plain feel." *Dickerson*, 508 U.S.

at 375-76. *See United States v. Hall*, 193 Fed.Appx. 125, 131 (3d Cir. 2006) (not precedential);[18]

_____

[17]

The *Dickerson* Court described the police officer's "further search" in his own words, which
came out at an evidentiary hearing: "As I pat-searched the front of his body, I felt a lump, a small
lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack
cocaine in cellophane." *Id.* at 369 (citation omitted).

[18]

Recognizing that *Hall* is not precedential, the Court only notes the same for its interpretation
of *Dickerson*.

*United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007) ("The proper question under *Dickerson*,

therefore, is not the immediacy and certainty with which an officer knows an object to be contraband

or the amount of manipulation required to acquire that knowledge, but rather what the officer

believes the object is by the time he concludes that it is not a weapon").  As the latter does not apply

here and the Government does not argue as much, the Court now turns to whether the contraband

in Pasca's pocket reasonably felt like a weapon.[19]

The unique set of facts here require two separate analyses as to the scope of the frisk: (1)

whether the pat-down frisk of the Defendant and the police officer's removal of the "bulge" were

within the confines of *Terry*; and, contingent thereon, (2) whether the police officer's decision to

open the envelope was likewise within the confines of *Terry*.[20]

From a general perspective, as to the frisk, Officer McMaster testified in the following

manner:

> I saw a bulge in one of his front pockets, and I touched that, and I
> didn't recognize what was in it.  It was a hard rectangular item or
> items.  It felt a little bit--not as wide as a cigarette pack, but it wasn't
> a cellphone.  I didn't know what it was at the time.

---

[19]

In his post-hearing brief, Defendant argues that even if the Court determines that the pat-down search was justified, the Court must still "suppress the evidence because the contents of Mr. Pasca's pockets were not immediately apparent as contraband." (Docket No. 74, at 7-8).  However, this assertion simply misunderstands the Government's argument, which the Court reads in this way: per Officer McMaster, the item or items in Pasca's pocket reasonably felt like a weapon, and thus the officer was justified in removing the item under *Terry* and its progeny, including *Dickerson*. (*See* Docket No. 62, at 11-12).

[20]

The Government fails to separate out these two analyses, instead combining the two into one analysis and only concentrating on Officer McMaster's decision to remove the item from Pasca's pocket. (*See* Docket No. 62, at 7-12).  In fact, the Government's brief wholly fails to address the envelope and whether the officer's decision to open it was objectively reasonable.

(Transcript, 10:4-8). Thereafter, Officer McMaster testified as to his knowledge regarding the ability to conceal weapons:

> We receive officer safety updates a lot from different agencies that are forwarded to us by our training supervisor, our chief.
> In March, we received an update about people hiding weapons in cellphones. They can make cellphones like guns. They can make-- hide small one-shot guns in cigarette packs. Keys can be turned into a knife in a reasonable amount of time.
> It was a power point presentation several pages long about all these weapons, or normal every-day objects they make into weapons.

(Transcript, 10:21-11:6). Further, on re-direct examination, Officer McMaster provided further testimony as to the item in Pasca's pocket:

> Q: And when you felt in his pocket and saw [sic] that bulge, did you consider the possibility that could be a weapon?
> A: Anything could be a weapon. You know, like I explained later, at this point in my career and the way the world is right now, we check everything. A key can be pushed into a knife. Anything could be made into a weapon these days. It has been proven.
> Q: So, you were concerned about it being a weapon?
> A: Yes, I was.

Transcript at 35:20-36:3.

While the Court declines to endorse the officer's assertion that "[a]nything could be a weapon," the Court nevertheless recognizes that Officer McMaster testified that, in his training and experience, weapons can be concealed in small packages and/or disguised as common personal property such as a cigarette pack or a cellular telephone. Furthermore, despite his seemingly contradictory statements regarding what he believed the "item or items" may or may not be, in the end, Officer McMaster testified that he "was concerned with [the hard rectangular item or items] being a weapon." (Transcript at 36:2-3). In *Terry*, the Court applied a lower standard (not amounting to probable cause) in order to allow officers to search suspects based upon apprehensions

of the danger from concealed weapons. "A subjective standard is thus even more appropriate for a search incident to a *Terry* stop than to a full arrest: if the officer does not in fact have a suspicion that the danger may exist, there is no logical reason for the court to supply one." *United States v. Hawkins*, 811 F.2d 210, 222 (3d Cir. 1987). Here, the officer's testimony that he was concerned that the item in the suspect's pocket may be a weapon leads the Court to believe that Officer McMaster had not ruled out the possibility that the "item or items" may be a weapon. (*See* Transcript at 36:2-3). In *Terry*, the Supreme Court indicated that the frisk serves the "immediate interest of the police officer in taking steps to *assure himself* that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly[,] it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23 (emphasis and alteration added); *see also United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007) ("Assuming that an officer is authorized to conduct a *Terry* search at all, he is authorized to assure himself that a suspect has no weapons. He is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon"). Unlike the officer conducting the search in *Dickerson* who continued to search the suspect's pocket "*after* having concluded that it contained no weapon," *Dickerson*, 506 U.S. at 378 (emphasis added), Officer McMaster's testimony hardly implies any assurance as to the contents of Pasca's pocket.

Further, and notwithstanding the officer's subjective beliefs, *Terry* requires the "facts [to] be judged against any objective standard." *Id.* at 21-22 (alteration added). Considering all of the relevant facts, specifically the officers' observation of two white males at an ATM machine near the report of the anonymous 911 caller, the two suspects immediate response of walking away upon

sight of the police officers in their patrol car, and Pasca's behavior including his refusal to remove his hands from his front pants pockets in response to several orders to do so even after Officer McMaster drew his weapon, the Court finds that a reasonable person in the officer's circumstances could have justifiably believed that the "hard rectangular item or items" in Pasca's front pocket was a weapon that posed a danger to himself or to Officer Beehner. As such, because the officer's exploration of Pasca's pocket never exceeded the justification of a *Terry* search, i.e., the protection of the police officer and others nearby, in that the officer reasonably believed the item or items in Pasca's pocket could be a weapon, Officer McMaster's decision to remove the item or items from Pasca's pocket did not exceed the bounds of *Terry*.

Having found that the police officer's removal of the "hard rectangular item or items" from Pasca's pocket was objectively reasonable and within the bounds of *Terry*, the Court now turns to whether the officer's decision to open the envelope was objectively reasonable and, again, within the confines of *Terry*.

In support of the scope of the *Terry* frisk,[21] the Government relies on *United States v. Edwards*, 53 F.3d 616 (3d Cir. 1995), in which the U.S. Court of Appeals for the Third Circuit upheld the district court's denial of a motion to suppress where police officers removed and opened a manila envelope taken from a person suspected of credit card fraud during a *Terry* stop where the officer detected "a large, hard, bulky object." *Id.* at 618. The Court "agree[d] with the district court that [the police officer] was within the bounds of *Terry* in opening the envelope because he was

---

[21] The Court notes that the Government only cites *Edwards* in support of the removal of the items from Defendant Pasca's pocket. Nevertheless, as it applies to the opening of the envelope, the Court will consider its relevance in this context as well.

justifiably concerned that it concealed a small caliber handgun." *Id.* at 619. In particular, the Court concluded that the police officer could reasonably have believed that a weapon might be a concealed in the envelope, described as a four-by-six inch envelope "packed full of nineteen hard plastic cards." *Id.* In addition, the Court noted that the Government presented "tangible evidence that a small-caliber handgun, in its holster, fits inside the envelope and has roughly the same feel inside the envelope as did the credit cards it contained." *Id.* The Court finds *Edwards* instructive here.

Similarly to the facts in *Edwards*, Officer McMaster removed an envelope from the Defendant's pocket, which, based on his prior testimony regarding the concealment of weapons, could possibly have contained a weapon posing a danger to himself or Officer Beehner. In such instances, *Terry* allows police officers to proceed with the frisk and search in order to secure their safety and the safety of others. To the contrary, Defendant seemingly argues that *Terry* requires the police officers to return the envelope to Defendant Pasca. However, the Court finds that *Terry* does not require a police officer in a situation such as the one Officers McMaster and Beehner found themselves in on the early morning of April 13, 2007, to return personal property to a suspect where said personal property could contain a weapon. The consequences of such a ruling could prove disastrous to the safety of the investigating police officer. The Court concludes that it was objectively reasonable that the envelope could have contained a weapon and, as such, Officer McMaster was justified in opening the envelope on the spot. Considering the totality of the circumstances, the Court declines to second guess Officer McMaster's decision to open the envelope in order to protect himself and Officer Beehner.[22]

---

[22]

Because the Court finds that *Terry* stop and frisk was supported by reasonable suspicion, the Court need not consider the Government's alternative arguments that the search was incident to an

II.     *Search of the vehicle*

In his motion, Defendant Pasca asserts that the search of the green mini-van found at the scene of the arrest violated his Fourth Amendment rights.  (Docket No. 55, at 3 n.1).  In response, the Government asserts that Defendant lacks standing to object to the search of the vehicle because the keys were in the possession of his co-Defendant and registered under his "assumed name." (Docket No. 62, at 22).  In his post-hearing brief, Defendant Pasca asserts that the keys were taken without consent and that the police searched the vehicle "without a warrant and without an exception to the warrant requirement."  (Docket No. 74, at 9-10).

As an initial point, the Court notes that the officers discovered the keys pursuant to a valid search incident to arrest on Defendant Ciocan's person, and thus, they did not need his consent to take the keys.  Further, to the extent he attempts to challenge the constitutionality of a search of his co-Defendant, Defendant Pasca lacks a legitimate (subjective or objective) expectation of privacy to do so.[23]  *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (providing that in order to challenge the reasonableness of a search and seizure, the proponent must possess a "legitimate expectation of

---

arrest for disorderly conduct under Pennsylvania law or that the evidence would have been inevitably discovered.

Furthermore, in his post-hearing brief *but not* in his original motion, Defendant makes passing reference in a footnote to probable cause to arrest without providing any developed argument or case law in support thereof.  (*See* Docket No. 74, at 8 n.7).  The Government does not address probable cause to arrest in its response.  As this issue has not been properly briefed by the parties, the Court will not address the same and expresses no opinion as to whether the police possessed probable cause to arrest Defendant Pasca based on the *Terry* stop and search and the evidence gathered therefrom.

[23]

For purposes of clarification, the Supreme Court has opined that "the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure ... belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing ... ."  *Rakas v. Illinois*, 439 U.S. 128, 140 (1978).

privacy"). Moreover, considering the search and arrest of both Defendants as well as the information from the anonymous 911 caller that the two male suspects traveled in a green mini-van, the Court finds that the officers possessed probable cause to search the vehicle.[24]  *See United States v. Himmelreich*, Criminal No. 1:CR-05-214, 2006 WL 1722399, at *6 (M.D. Pa. June 16, 2006) (citing *United States v. Ross*, 456 U.S. 798, 804-09 (1982) (providing that "it has long been settled law that police officers may lawfully search a vehicle when they have probable cause to believe it contains evidence of criminal activity")).  Finally, assuming *arguendo* that Defendant Romulus Pasca possessed a legitimate expectation of privacy in the vehicle (as the alleged owner) in order to challenge the search, an issue upon which conflicting testimony exists, *compare* (Transcript at 32:20-23) (Officer McMaster testifying that the vehicle was registered to "Liviu Pasca") *with* (Transcript at 63:4-9) (Special Agent Lauster testifying that the vehicle was registered to Defendant, Romulus Pasca),[25] the Court finds that law enforcement later searched the same pursuant to a valid search warrant.[26]  (*See* Transcript 61:16-18).  Accordingly, to the extent that the Defendant challenges the on-the-spot search of the vehicle, in which the officer opened the door and looked in the glove box, any evidence garnered from that search would have been inevitably discovered.  *See Nix v. Williams*,

---

[24]

The Court notes that neither party has specifically pointed out any evidence gathered from said search.

[25]

The Court notes that, in response to the conflicting testimony, the Defendant has presented no additional evidence to establish his legitimate expectation of privacy in the vehicle, a burden which he bears. *Rakas*, 439 U.S. at 130 n. 1; *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000).

[26]

The Court notes that Defendant has not challenged the warrant but reserved the right reserved the right to do so upon receipt of the same.  (*See* Docket No. 55, at 3 n.1).

467 U.S. 431 (1984).

III.    *Statements*

In his motion, in addition to arguing that his alleged statements should be suppressed as "fruit of the initial lawful stop, search, and seizure," (Docket No. 55, at 6), which, based on the Court's findings above, is unfounded, Defendant alternatively argues that his statements should be suppressed because they were made in violation of the Supreme Court's decision in *Miranda*. (Docket No. 55, at 7-8). The Government responds that Defendant Pasca knowingly, intelligently and voluntarily waived his *Miranda* rights as evidenced by way of the signed *Miranda* waiver form, the lack of any coercion or undue stress placed upon the Defendant during Special Agent Lauster's interview, and the fact that even after his initial appearance at which a United States Magistrate Judge informed him of his rights, Defendant Pasca continued to "voluntarily provide information to the FBI." (*See* Docket No. 62, at 17-20). The Court agrees.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), in which the Supreme Court addressed the constitutional issue of "the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way," *id.*, at 445, the Court held the following:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be

29

> warned that he has a right to remain silent, that any statement he does
> make may be used as evidence against him, and that he has a right to
> the presence of an attorney, either retained or appointed.

*Miranda*, 384 U.S. at 444 (footnote omitted). Statements elicited during a custodial interrogation

are admissible only if a person voluntarily, knowingly, and intelligently waives his rights. *Id.* at 444,

475 (providing that a "defendant may waive effectuation of these rights, provided the waiver is made

voluntarily, knowingly and intelligently"). As to waiver, "[w]henever the State bears the burden of

proof in a motion to suppress a statement that the defendant claims was obtained in violation of our

*Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *Colorado*

*v. Connelly*, 479 U.S. 157, 168 (1986) (citations omitted). However, if a person requests counsel

at any point during such an interrogation, law enforcement officials must stop the questioning.

*Miranda*, 384 U.S. at 445.

In determining whether a defendant's waiver was knowing, intelligent, and voluntary, the

inquiry is two-fold:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather
> than intimidation, coercion, or deception. Second, the waiver must
> have been made with a full awareness of both the nature of the right
> being abandoned and the consequences of the decision to abandon it.
> Only if the 'totality of the circumstances surrounding the
> interrogation' reveal both an uncoerced choice and the requisite level
> of comprehension may a court properly conclude that the *Miranda*
> rights have been waived.

*United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (citing *Moran v. Burbine*, 475 U.S. 412,

421 (1986)); *see also United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989).

In support of his argument that his waiver was not voluntary, knowing, and intelligent,

Defendant relies upon the purported "language barrier in this case." (Docket No. 55, at 8). In turn,

he cites to two cases: *United States v. Gariby*, 143 F.3d 534 (9th Cir. 1998) and *United States v. Short*, 790 F.2d 464 (6th Cir. 1986).  The Court will address each case in turn.

In *Gariby*, the defendant challenged the district court's finding that he validly waived his *Miranda* rights, asserting that he did not understand the officer's recitation of rights in English "because his primary language is Spanish and he has a low verbal IQ."  *Id.* at 537.  In holding that the district court erred in failing to suppress his inculpatory statements, the Court relied on the following: (1) contrary to the district court's conclusion, the officer did not offer the option of interrogation in Spanish and thus the defendant did not decline such an offer; (2) "the record clearly indicate[d] that [the defendant's] primary language is Spanish and he understands only a few things in English," based on his high school grades in English instruction and testimony from his high school football coach, *id.* at 537-38; and (3) "[i]t is undisputed that [the defendant's] IQ is bordelrine retarded and that he has difficulty understanding the English language," *id.* at 538.  On the contrary here, Special Agent Lauster's testimony indicates that the Defendant understood his rights when read and explained to him as well as when he read and signed the waiver of rights form.  Likewise, Officer McMaster testified that Defendant Pasca "seemed to understand" his orders near the ATM machine, (Transcript at 37:22), and "[w]hen we got him back to the jail cell, he understood verbal orders and commands and requests while we were processing him."  (Transcript at 37:22-24).  Further, the Court's first-hand impression of the Defendant at the suppression hearing revealed a Defendant fully engaged in his defense and the subject matter of the hearing.  Unlike the defendant in *Garibay*, there is no additional evidence from the Defendant before the Court here regarding Defendant's poor grasp of the English language or low IQ.  Furthermore, the Court in *Garibay* noted that additional considerations affecting a valid waiver were not present, in particular whether

defendant signed a written waiver, whether the defendant was advised of his rights in his native tongue, and whether the defendant appeared to understand his rights. *Id.* at 539. The record reflects that these considerations are present here. In fact, the Court in *Garibay* went so far as to predict that "[t]his entire discussion could probably have been avoided had the customs agents obtained a written *Miranda* waiver." *Id.* at 539 n.10. As to this point, the Court agrees.

In *Short*, the U.S. Court of Appeals for the Sixth Circuit found that the government failed to meet its burden to establish a valid waiver of Miranda rights where defendant had only been in the country for about three months and was not fluent in English. 790 F.2d at 469. As an initial point, the parties agreed there that the defendant did not receive *Miranda* warnings before her first interview with police officers, during which she made inculpatory statements. Such is not the case here. Further, pertinent in *Short*, the government agents conceded that the defendant's English was so poor that they took special precautions in explaining the *Miranda* warnings as well as the magistrate judge's view that the defendant would not be able to understand the proceedings against her without translation into German. *Id.* Quite to the contrary, as the Court has previously noted several times, Special Agent Lauster testified that the Defendant appeared to understand his *Miranda* warnings and never expressed, let alone conceded that Pasca's understanding of English required "special precautions." While the Agent took certain precautions by obtaining the relevant forms in Pasca's native tongue prior to the second interview, subsequent to his initial waiver in English, such is sound and thorough police work, which the Court finds, without more, does not reflect upon the Agent's opinion as to the Defendant's ability (or, more appropriately, purported inability) to understand English. Accordingly, the Court finds *Gariby* and *Short* inapposite to the case *sub judice*.

The facts here paint a different picture. The record demonstrates that Special Agent Lauster

interviewed the Defendant on two separate occasions on April 13, 2007: (1) at the Monroeville Police Department prior to the Defendant's initial appearance before a magistrate judge; and (2) at the courthouse after his initial appearance before a magistrate judge. Before the first interview, Special Agent Lauster testified that the Defendant signed and executed a FD-395 form advising him of his rights, (*see* Docket No. 67-3, Exh. 1), as well as a FD-26 form consenting to a search of Room 308 at the Red Roof Inn, (*see* Docket No. 67-4, Exh. 2). While both forms were in English, Special Agent Lauster testified that Pasca appeared to understand, read, and signed the forms. (*See* Transcript at 54:13-20 & 55:17-25). Before the second interview, Special Agent Lauster testified that the Defendant again signed and executed another FR-395 form and another FD-26 form, both of which appeared in Romanian, Defendant's native tongue. Again, Special Agent Lauster testified that, after he reviewed the contents of the forms with him orally, the Defendant appeared to read each form and signed each form. (*See* Transcript at 59: 9-14 & 60:25-61:5). Defendant's execution of both forms indicates his voluntary waiver of his rights. *See United States v. Carney*, Criminal No. 06-350, 2007 WL 1864633, at *15 (W.D. Pa. June 27, 2007) ("The [waiver of rights form and consent to search form] executed by defendant indicate that he voluntarily waived his *Miranda* rights and that he voluntarily consented" to the search); *United States v. Giampa*, 904 F.Supp. 235, 276 (D.N.J. 1995) ("The initialing of the *Miranda* waiver form by [the suspect] and his signing of the consent to search form were *inconsistent* with a finding that his will was overborne") (second emphasis added); *Government of Virgin Islands v. Kirnon*, 377 F.Supp. 601 (D.V.I. 1974) (finding that evidence that the police explained *Miranda* rights to the defendant and that he was given a copy of the rights to read as well as his statement during the interrogation that he understood his rights and written consent form signed by defendant demonstrated that he knowingly and intelligently waived

his *Miranda* rights).  Finally, nothing in the record indicates that Defendant Pasca requested counsel at any time or that any law enforcement person threatened or coerced the Defendant in any way and Defendant has directed the Court to no such evidence or testimony.[27]

CONCLUSION

Based on the foregoing, the Court **DENI** ES Defendant's Motion to Suppress Evidence and Statements [55].

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   April 14, 2008.

CC:    Counsel for all parties.

---

[27]

To the extent that Pasca requests suppression of all evidence retrieved in the hotel room, assuming *arguendo* that he possesses standing to challenge as much, the Court finds that he consented to the search of the same by signing and executing two consent to search forms (one in English and one in Romanian).  (*See* Docket No. 67, Exhs. 2 & 4).  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973) (allowing warrantless search if consent is given voluntarily).